# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 20-sw-01004-KLM |
| *or identify the person by name and address)* | ) | |
| | ) | |
| Items seized from Christopher St. John on August 11, | ) | |
| 2020, as described in Attachments A-1 and A-2 | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A-1 and A-2"**, which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____Colorado_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B-1 and B-2"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Interstate communication of threats |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s Herbert E. Hogberg III*
_____
*Applicant's signature*

FBI Special Agent Herbert E. Hogberg III
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **26 Aug 2020**
_____
*Judge's signature*

City and state: ___Denver, CO___
Hon. Kristen L. Mix, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

IN THE MATTER OF THE SEARCH OF
ELECTRONIC DEVICES DESCRIBED IN
ATTACHMENT A-1 AND A LAPTOP CASE
AND PAPERS DESCRIBED IN
ATTACHMENT A-2

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Herbert E. Hogberg III, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing: (a) the examination of two

electronic devices which are currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B-1, and (b) a laptop

case and papers seized along with one of the electronic devices.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been so

employed for over 18 years.  My current responsibilities include the investigation of violent

crime to include bank robbery, kidnapping, crimes against children, and threats.  I have training

and experience with digital evidence and electronic information.  I have also participated in

investigations involving emails, text messages, and the Internet.

3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.  This

affidavit is based on my personal knowledge, information provided to me by other law

enforcement agents, interviews of witnesses, my review of records related to this investigation,

communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## IDENTIFICATION OF THE ITEMS TO BE EXAMINED

4.     The property to be searched are described as:

   a.   A silver MacBook Model A1990 with Serial #CO2Z2D92LVCF (the "Laptop"), and a gray iPhone packaged in a clear case (the "iPhone") (together, the "Devices"), seized from Christopher St. John on August 11, 2020.  The Laptop is currently being held in Property and Evidence at the Boulder Police Department, 1805 33rd Street, Boulder, CO and the iPhone is currently Boulder County Computer Forensics Lab at 5600 Flatiron Parkway, Boulder, CO, and

   b.   A laptop case containing papers (the "Laptop Case and Papers") seized from Christopher St. John on August 11, 2020, which are currently being held at Property and Evidence at the Boulder Police Department, 1805 33rd Street, Boulder, CO.

5.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B-1.

## PROBABLE CAUSE

*SUMMARY OF INVESTIGATION*

6.     As described below, an individual named CHRISTOPHER ST. JOHN has, since approximately November 2019, been engaging in threatening communications directed toward his ex-wife and others.  ST. JOHN was arrested on approximately August 11, 2020, in Boulder, Colorado, on a state warrant issued out of Illinois.  The Devices and Laptop Case and Papers

were seized at the time of ST. JOHN's arrest.  ST. JOHN has since been charged with a violation

of Title 18, United States Code, Section 875(c) in the Northern District of Illinois.

***BACKGROUND OF CHRISTOPHER ST. JOHN***

7.      According to the ex-wife of ST. JOHN ("Mrs. St. John"), she and ST. JOHN were

married in approximately 1998 and had several children together. During their marriage, the

couple sought therapy and, in approximately 2005, according to the therapist, ST. JOHN had

problems controlling his anger and his rage issues were not in control.

8.      According to Mrs. St. John, in approximately January 2019, ST. JOHN lost his

job and his behavior became more erratic and his explosive behavior became more pronounced.

In approximately March 2019, ST. JOHN informed Mrs. St. John that he wanted a divorce. ST.

JOHN began making repeated and threatening phone calls to their child's pediatrician because

ST. JOHN was not in agreement with a treatment plan for a condition from which one of their

children suffered. According to Mrs. St. John, ST. JOHN visited the pediatrician's office in a

rage about this issue.

9.      According to Mrs. St. John, in approximately March 2019, ST. JOHN stated that

he was going to stay at a hotel, instead of living with the family. After several nights away from

home, ST. JOHN began discussing extreme political views and stated that he believed people

were spying on him from the trees at a nearby park.

10.     According to Mrs. St. John, in approximately June 2019, one of the St. John

children confronted ST. JOHN about his erratic behavior and extreme political views. ST. JOHN

yelled at the child which caused Mrs. St. John to fear for her and the childrens' safety. Mrs. St.

John took the children and stayed with a relative.

11.     According to Mrs. St. John, in approximately July 2019, ST. JOHN told one of his children that he was moving to Colorado to buy a house in the mountains.

12.     Shortly thereafter, Mrs. St. John contacted an attorney ("Attorney 1") and sought representation to file for divorce from ST. JOHN. During the pendency of the divorce proceedings, ST. JOHN did not appear for court hearings, and in October 2019, the Circuit Court of Cook County granted a default divorce in favor of Mrs. St. John.

13.     According to Mrs. St. John, since approximately November 2019, ST. JOHN has made numerous threatening voicemail messages, text messages, and Facebook messages. In approximately June 2020, Mrs. St. John contacted the Arlington Heights Police Department ("AHPD") in reference to these threatening communications.

### ST. JOHN'S THREATENING EMAILS TO ATTORNEY 1

14.     On or about June 3, 2020, Attorney 1, who resides in the Northern District of Illinois, began receiving threatening emails from cstjohn324@gmail.com.[1] The first email stated:[2]

> This will be used against you, in my fucking court of law. Because you tried to murder me via the power entrusted in you, I'm legally able to fuck you up. See you soon [Attorney 1's first name] – I have many homeboys that n Illinois: some are Cops, lawyers, criminals/gangbangers. Have fun and good luck.

15.     On or about June 4, 2020, Attorney 1 received two emails from cstjohn324@gmail.com. The first email said:

> Since I did not hear from you, I will be putting out a call to have you fucked up on #FB [Facebook]. For what YOU did to me; financial murder. You and your family will be targets; good luck and you should not have tried to kill me. Your a dead man."

---

[1] As described further below, this is ST. JOHN's email address.

[2] All quotes are included verbatim, including typographical and grammatical errors.

The second email stated:

> You are fucked and you and your family is gonna be killed for what YOU did to me. Hits are out on you and I already let my 5.0 [police officer] friends know. Get me my money before we get your daughter and wifey. I'm gonna rape her for what YOU did to me.

16.     On or about June 19, 2020, Attorney 1 received three emails from

cstjohn324@gmail.com. The first email stated:

> Send me a copy of what you did to me legally. I'm having you arrested for what you did to me. Now your having Northbrook cops calling me and threatening me with violence. Just will be served. You are on motice that you and your family will have visitors. You better le[t] me know what you did to me or your gonna fucking pay homeboy!

The second email stated;

> Remember I warned you to be a good boy from jump; but you decided to be a maggot. Be prepared for the worst you fucking maggot. I'm well connected with 'folks.'[3]  That's a gang if you are unaware.

The third email stated:

> My lawyer knows you from John Marshall. He's the same age, and is well connected in the Cook County Court system. He will be assisting me in having you prosecuted for what you did to me. He's worked defense and offense for 30 years. Good luck with my high school friend (thumbs up emoji).

### THREATENING PHONE CALLS TO THE NORTHBROOK POLICE DEPARTMENT

17.     On or about June 16, 2020, at approximately 9:11 a.m., the Northbrook, Illinois,

Police Department ("NPD") received a call from XXX-XXX-6254 in which a male caller, later

identified as ST. JOHN,[4] stated, "I need to file a report on one of your citizens. [Attorney 1], he

---

[3] Based on my training and experience, the "Folks" are one of two factions of gang affiliation in Chicago, the other being "People."

[4] The identification of ST. JOHN as the caller is discussed in detail below. In summary, each of the threatening calls was made from the same telephone number, which is subscribed to by ST. JOHN. In many of the calls ST. JOHN self-identifies or discloses biographical information consistent with ST. JOHN. ST. JOHN's ex-wife has listened to

is a Jew lawyer. He took all my money from me and pulled some strings. He fucked me over.

I'm going to fucking take care of him. He's a dead man for harassing me."[5]

18.     On or about June 18, 2020, at approximately 8:37 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

> One of your residents is a Jew lawyer, [Attorney 1], lives on [Attorney 1's residence's street]. Tell him to stop harassing people. He screwed me over and he won't take my messages, he's trying to financially kill me. If you don't take care of him, I will. Alright he's been a problem, he's a danger. Send cars to his place and start asking him questions. Go do your fucking job.

19.     On or about June 18, 2020, at approximately 10:29 a.m., NPD received a call

from XXX-XXX-6254 in which ST. JOHN stated:

> I'm an attorney, there's another divorce attorney that lives in your jurisdiction and threatening my client, is there a Sergeant or Commander that I can report this to? Whoever is handling the Jew fucking maggot lawyer [Attorney 1]. That's what my client told me. I'm an attorney, a personal injury lawyer, my clients name is none of your fucking business.

20.     On or about June 19, 2020, at approximately 8:30 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated"

> I need you to send some guys to [Attorney 1]'s house, like [Attorney 1's address], Jew lawyer. He's been harassing me, you guys harass people and I want you guys to fuck him up for me. My name is none of your fucking business.

21.     On or about June 20, 2020, at approximately 7:35 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

---

recordings of some of the calls and identified the caller as ST. JOHN. I have listened to each of the recorded calls identified in this affidavit and believe that each call was made by the same person. Furthermore, I have reviewed an audio and video recording of ST. JOHN taken upon his arrest on state charges in Colorado, and I believe ST. JOHN is the same person who made the recorded calls detailed in this affidavit.

[5] All phone calls quoted here were recorded by the respective police department and have been preserved, unless otherwise noted.

I have a complaint on someone, his name is [Attorney 1], he's on [Attorney 1's address]. This maggot of a man is a lawyer, and caused chaos in my life. He's such a coward and he will not get back to me. I want a couple of your biggest and baddest cops to go to his house and if he doesn't get me my money back and make me whole, I am personally going to fucking pay and have someone put a fucking bullet in his head.  Do you understand? Give me back my money, if not, he's going to fucking literally kill you and I will. I will hire somebody to kill him, he will know who I am, tell him there's a guy 6'3, 185 that's going to fucking rip him limb to limb. He will know who I am. I am the guy who is going to fucking kill him unless he gets me my money. If you don't send someone over there and let him know he is a dead man, you are going to have blood on your hands.

22.      On or about June 20, 2020, at approximately 10:32 a.m., NPD received a call

from XXX-XXX-6254 in which ST. JOHN stated:

Give me Officer [Badge number], is [Officer's name] working? When you see him, tell him to stop the threatening emails and tell him if he makes one more call, I am going to have gang bangers knock his fucking teeth out, yea tell him that.

23.      On or about June 23, 2020, at approximately 9:17 a.m., 9:18 a.m., and 9:19 a.m.

NPD received calls from XXX-XXX-6254 in which ST. JOHN stated in one of the calls:

Is [officer badge number] there, [Officer] is [officer badge number] there? Tell that fuck I am going to knock his fucking teeth out, I will take him apart with my hands, if he calls me one more time I am going to fuck him up. Tell [officer badge number] I am going to fuck him up, tell that fucking maggot, if he calls me one more fucking time, I'm coming down there and I am personally going to rip him out of his fucking cruiser and kick his fucking ass, do you hear me?

24.      On or about June 25, 2020, at approximately 8:49 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

[Detective Commander], I have a Jew fucking lawyer on [Attorney 1's street address] that I am going to fuck up. I am going to go to his house, I am going to yank him out, and I am going to knock his fucking teeth out with my bare hands. Yea I am coming there.

25.      On or about June 26, 2020, at approximately 8:11 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

Can you do me a favor, I need you to work with me. There's a Jew lawyer that lives in your town in Northbrook, he's been a divorce lawyer for 20 years. He

took me to the—went to the judge, and did a bunch of bad stuff before the judge, this led me to be homeless, he owes me a lot of money.

The dispatcher asked "This is Christopher, correct?" to which ST. JOHN responded:

You guys, yeah yeah that's all water under the bridge, I need some justice, I am a paying Illinoisan out of Arlington Heights.  If he doesn't reach out to me and make me whole again, I swear to god, I am going to pay someone to go to his house and fill it with bullet holes, I am serious. The lawyers name is [Attorney 1], he rolled me. I'm in fucking Colorado, I'm a risk to your police department and if you don't take care of this maggot, I am going to roll you guys. I'm going to put a fucking bullet in his head, if he doesn't start working with me, bad things are going to happen. His ass is grass, put him on notice, or I'm going to fucking kill him.

26.     On or about June 30, 2020, at approximately 7:50 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

I killed someone: [Attorney 1]. I am looking to go over and put a bullet in his fucking head, probably soon, he's a fucking maggot Jew lawyer, he is my cunt wife's attorney, here's what I am going to do.  I put out 10,000 dollars, I hired someone, and if you don't go over there and tell him to contact me today, so we can work this out, he is going to be dead. There's someone going over there and I am going to have them go over there and kill him. I am on the streets, I am dying. I gotta kill him, so if you want to warn him, go warn him, but he will be dead by the end of the week I suspect. You've been noticed, I will kill him, [Attorney 1].

27.     According to NPD, ST. JOHN made numerous other calls and/or voicemails that

were not recorded in which he threatened NPD officers and Attorney 1.

28.     According to NPD, NPD officers repeatedly told ST. JOHN to stop contacting

NPD unless it was for official business, however, he continued to call.

29.     On or about July 8, 2020, at approximately 10:00 a.m., according to an NPD

Detective Commander, ST. JOHN called the Detective Commander and stated, in summary, that

he was going to put a bullet into [Attorney 1]'s head and would put a bullet into [Detective

Commander]'s head.[6] ST. JOHN further stated, in summary, "I'm going to come to the station

naked and fuck you with my 10 inch cock." ST. JOHN also referenced an Arlington Height

Police Department report regarding his son. ST. JOHN made additional threats to shooting

Attorney 1 in the head to which the Detective Commander advised ST. JOHN an arrest warrant

would be obtained for the threats. ST. JOHN replied, in summary, "Get all the warrants you

want, I don't care, I'm going to slit [Attorney 1]'s throat, put a bullet in [Attorney 1]'s head, or

maybe I'll do you a favor and put a bullet in my head," and that the Detective Commander would

see ST. JOHN in Northbrook in two weeks.

      30.     On or about July 29, 2020, at approximately 7:32 a.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated:

> I want to report a homicide, [Attorney 1's address], it's your glorious Jewish
> lawyer [Attorney 1's name and residence's street], I'm in Northbrook right now,
> I'm right behind your police station with a fucking gat [firearm]."

ST. JOHN also stated he was going to Attorney 1's residence where he would slit Attorney 1's

throat and blow Attorney 1 up with some of ST. JOHN's Special Force [military] buddies.

      31.     On or about July 29, 2020, at approximately 5:41 p.m., NPD received a call from

XXX-XXX-6254 in which ST. JOHN stated: "Where's [Detective Commander]? [Detective

Commander] gave me erroneous information and I'm going knock his teeth out." ST. JOHN

further stated, in summary, that if he received one more phone call [from NPD] then he was

going to "roll in" with an M-16, that he was in the parking lot of the [NPD] police station right

now with an M-16 and he was coming into the [NPD] station. ST. JOHN asked how many

officers were coming out and stated they were all going to die.

---

[6] This call was not recorded. The quotes in this call are based on the Detective Commander's memory of statements
St. John made to him as listed in the report.

32.     On July 31, 2020, at approximately 6:58 p.m., NPD received a call from XXX-XXX-6254. When the dispatcher who answered the call asked who was calling, ST. JOHN stated, "Christopher fucking St. John" and began yelling at the dispatcher about the Detective Commander and Attorney 1.

33.     On or about July 31, 2020, at approximately 9:02 p.m., NPD received a call from XXX-XXX-6254. When the dispatcher asked who was calling, ST. JOHN responded, "Yea, this is Mr. St. John." ST. JOHN further stated, in summary, that he was upset his ex-wife had not submitted a title transfer and asked the documents be sent to cstjohn324@gmail.com. ST. JOHN also state, in summary, that he did not have a firearm but he was going to buy a rocket launcher and he was currently out of town.

34.     On or about August 1, 2020 at approximately 8:08 a.m., NPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, that he was going to go a public place the same day and start killing people due to his anger with the Northbrook Police Department and Arlington Heights Police Department. When the dispatcher asked for the caller's name, ST. JOHN first stated his name was "Satan," but later in the call identified himself as "Christopher St. John." ST. JOHN also said he had a gun and plastic explosives and that he was going to try to kill 200 people. ST. JOHN further stated he was going to come to the Northbrook Police Department, kill the dispatcher and three other officers, that he had a "hit" on the Detective Commander, he would kill the Detective Commander and Detective Commander's family. ST. JOHN stated that if a police officer pulled him over, he wanted to begin a gunfight immediately. When asked where he was, ST. JOHN stated "Iowa," that he was a few hours away, and would first "hit" Arlington Heights Police first then Lake Cook Road to Northbrook Police Department.

ST. JOHN stated he had numerous guns and ammunition and told the dispatcher to tell the Detective Commander that the Detective Commander's life would be ending very shortly.

35.     On or about August 2, 2020, at approximately 7:49 a.m., NPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, that people were dying today and he was outside the police department. While the first dispatcher was on the phone with ST. JOHN, a second dispatcher overheard the conversation between the first dispatcher and ST. JOHN. The second dispatcher made an internal call to another NPD officer and related that ST. JOHN was currently on the phone with the first dispatcher. The second dispatcher also informed the other NPD officer that, earlier in the day, the second dispatcher knew that ST. JOHN threatened to kill a person in Wyoming and a few people in Nebraska but ST. JOHN stated he was then outside the NPD with guns on the southeast corner of the building. According to NPD, ST. JOHN made several calls during the day threatening to destroy NPD's communications.

36.     On or about August 5, 2020, at approximately 8:19 a.m., NPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, that the police needed to call Attorney 1 because ST. JOHN was being given information on Attorney 1's daughter and son so he was going to send people to the daughter's college to mess with her. ST. JOHN said he was going to keep calling the police until they fixed his situation and the police needed to warn Attorney 1 that Attorney 1 was in danger. ST. JOHN stated he was getting so upset that he was going to kill Attorney 1 or an officer.

37.     On or about August 10, 2020, at approximately 9:09 a.m., NPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, he was with a police department. The NPD dispatcher recognized the caller as ST. JOHN. ST. JOHN stated he had a knife to a guy he had with him and that he was going to kill his ex-wife.

38.     On or about August 10, 2020, at approximately 9:17 a.m., NPD received a call from XXX-XXX-6254 in which ST. JOHN stated he was ready to "take lives."

***THREATENING PHONE CALLS TO THE ARLINGTON HEIGHTS POLICE DEPARTMENT***

39.     On or about June 4, 2019, the doctor's office of ST. JOHN's children (described above) called the Arlington Heights, Illinois, Police Department (AHPD) and informed the dispatcher that ST. JOHN was in the office and was being aggressive and loud to staff on May 21, 2019, and since then ST. JOHN had begun making telephone and email complaints to the doctor's office, as further described below.

40.     On or about October 18, 2019, the employer of Mrs. St. John's relative ("Relative 1") filed a report with AHPD that ST. JOHN was making harassing telephone calls to Relative 1 and other staff regarding the treatment of ST. JOHN's son, as described above.

41.     On or about April 26, 2020, Relative 1's wife filed a report with AHPD reporting that ST. JOHN sent threatening electronic messages to Relative 1's wife and made threatening telephone calls to Relative 1. Relative 1's wife advised she received two messages from ST. JOHN via Facebook Messenger, "You're gonna pay for what you did. You fucking Cunt" and "We are looking into [Relative 1's first name] involvement with Harvest; you stole from good people. U r a criminal and a Satanist. Your day is coming". Relative 1's wife additionally reported that Relative's 1 father received two messages via Facebook Messenger from ST. JOHN, "You son did some very bad things; your family is going to pay these. U r a Satanist-remember the crusades" and "Tell your wife to prepare for your funeral". On or about June 8, 2020, Mrs. St. John filed a report with AHPD claiming that between approximately May 11, 2020, and approximately June 4, 2020, ST. JOHN had left threatening email and voicemail

messages[7] for Mrs. St. John. On May 11, 2020, the voicemail message said in part, "You're gonna die" and "You're attorney is gonna die." On June 4, 2020, Mrs. St. John received an email from ST. JOHN's email which stated, "You are a fucking cunt and I'm gonna slit your fucking throat for trying to kill me. You better get my money or your gonna fucking die for murder" and "I've got eyes on you now and I'm gonna fucking get you for what you did to me; you fucking cunt".

42.    On or about July 3, 2020, the doctor's office of ST. JOHN's children filed a report with AHPD that ST. JOHN called[8] the office from XXX-XXX-6254 and stated, in summary, "Is [Doctor] there? You tell her because of what she did, because she messed in my life I'm going slit her fucking throat. I'm coming in there with a fucking gun, you fucking cunt."

43.    On or about July 30, 2020 at approximately 9:15 a.m., AHPD received a call from XXX-XXX-6254 in which a male later identified as ST. JOHN stated, in summary, that he wanted the police to contact his wife. ST. JOHN was advised by the officer who answered the call that he had been previously told not to call the police department and his calls were being recorded. During the call, ST. JOHN was repeatedly told to stop calling the police department. ST. JOHN stated he and five federal agents were going to come into the police department and destroy it by blowing it up. ST. JOHN stated his call was a threat and a promise. ST. JOHN provided his telephone number of XXX-XXX-6254 and a case number previously filed with AHPD regarding his son.

---

[7] According to the police report, Mrs. St. John was advised to save the voicemails. The reporting officer scanned in the email printouts into their report system.

[8] This call was not recorded. The quotations are based on what the officer was told by the person who filed the report over the phone.

44.     On or about August 1, 2020, at approximately 7:58 a.m., AHPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, that he was going to go kill someone. ST. JOHN identified himself by his full name. ST. JOHN stated he was going to kill his wife and the wife of the officer on the line. ST. JOHN stated he had a "Gat 17" [firearm] on him and after killing his wife then he would put a bullet in the head of the officer on the line. ST. JOHN threatened to come to the police department and would start "taking you guys out and popping you." ST. JOHN continued and stated he was going to kill the officers. ST. JOHN stated he was at an address in Des Plaines, Illinois, and he was going into a McDonald's across the street and start killing people with his uncle's 357 [firearm].

45.     On or about August 2, 2020, at approximately 7:46 a.m., AHPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, he was going to kill four people. ST. JOHN later changed it to five people. ST. JOHN stated he would kill the five people in exchange for the five lives that ST. JOHN believed were ruined (those lives were ST. JOHN's, his three boys', and his dog's) but hoped the people he killed were police officers. ST. JOHN stated that since the lives of his sons, his dog, and him were ruined by the police not helping him then he was going to kill people. ST. JOHN stated he was getting out of his car, fully loaded, looking for people to kill.

46.     On or about August 3, 2020, a member of the doctor's office of ST. JOHN's children filed a report with AHPD that ST. JOHN called[9] the office using XXX-XXX-6254 and asked for the doctor he had previously threatened and then stated, in summary, "I'm the man

---

[9] This call was not recorded. The quotations are based on what the officer was told by the person who filed the report over the phone.

hired to investigate her [Doctor]. I'm going to be straight with her [Doctor]. I was paid $10,000

to fuck her up. She needs to get back to me quick."

  47. On or about August 10, 2020 at approximately 8:23 a.m., AHPD received a call

from XXX-XXX-6254 in which ST. JOHN stated, "Hey, do you want this woman dead or not?

Do you want me to kill my wife?" ST. JOHN further stated he was in Arlington Heights and

gave his ex-wife' address, stating he was going to slit her throat. ST. JOHN provided his full

name and telephone number (XXX-XXX-6254), stating he had killed his wife and she was dead.

ST. JOHN said he was going to Wisconsin to cut her body up which was in his trunk. ST. JOHN

threatened to slit the dispatcher's throat when the dispatcher got off work. ST. JOHN said he was

the devil and he was possessed. ST. JOHN stated he had a gun and he was going to kill more

people.

  48. On or about August 10, 2020, at approximately 8:28 a.m., AHPD received a call

from XXX-XXX-6254 in which ST. JOHN stated, in summary, that he was going to take a

baseball bat and smash in the dispatcher's head. ST. JOHN stated he was going to do his first kill

today and acknowledged his name was "Chris." ST. JOHN also said he saw some people in the

mountains and he was going to go kill them. ST. JOHN stated that whatever actions he would

take would be based on the dispatcher's responses. ST. JOHN said that if he did not talk to a cop

in 5 seconds, he would start killing people.

  49. On or about August 10, 2020, at approximately 8:34 a.m., AHPD received a call

from XXX-XXX-6254 in which ST. JOHN stated, in summary, that he was going to put a bullet

in the call taker's head. ST. JOHN said he was going to kill whoever he wanted today. ST. JOHN

stated he had his wife in his trunk after kidnapping her the night before. ST. JOHN said he was

killing someone today and provided his ex-wife's home address. ST. JOHN stated his telephone

number was [Mrs. St. John's phone number] and he was calling from that number and provided

his name as his ex-wife's name. ST. JOHN wanted the officer to call Mrs. St. John's number

after he hung up and to tell the woman who answered that phone that her life was in danger.

50.     On or about August 10, 2020, at approximately 9:00 a.m., AHPD received a call

from XXX-XXX-6254 in which ST. JOHN stated, in summary, that he wanted to report a

murder in progress and gave his ex-wife's address. ST. JOHN stated he had witnessed the

murder and "the man" had taken the woman in a 2008 [Toyota] Camry with him already starting

to slit her throat. The dispatcher asked if the caller was "Chris" and ST. JOHN first denied it was

him but then admitted it was him. ST. JOHN stated he had gotten his wife and that he thinks

about killing his wife every waking moment by slitting her throat. ST. JOHN stated every day he

thinks about breaking his ex-wife's neck, wants to chew her face off, and carving her up. ST.

JOHN further stated he was going to find someone who looked like his wife and would kill her

since he could not get to his wife in Illinois. ST. JOHN stated he was stalking women right now

and he would spend three days videotaping a woman as he tortured her. ST. JOHN stated he was

going to kill a woman today and take a life. ST. JOHN also stated he was going to "take a

woman and carve her up" and he was turned into a killer and that he had been stalking a woman

for a month who he was going to take and kill.

***THREATENING PHONE CALLS TO THE BUFFALO GROVE POLICE DEPARTMENT***

51.     On or about July 29, 2020, at approximately 11:19 a.m., the Buffalo Grove,

Illinois, Police Department (BGPD) received a call from XXX-XXX-6254 in which a male later

identified as ST. JOHN stated, in summary, that he needed to leave a message for the Chief of

Police. ST. JOHN identified himself as Rob Johnson[10] from the federal government. ST. JOHN stated "we will be in your jurisdiction patrolling, it's military, we're coming in, it's federal troops, it is part of the 135 plan, I've been told by my general to make this call."

52.     On or about July 29, 2020, at approximately 11:22 a.m., BGPD received a call from XXX-XXX-6254 in which ST. JOHN stated he was trying to leave a message and didn't want to be put on hold. That same day ST. JOHN called BGPD six times in six minutes.

53.     On or about August 3, 2020, at approximately 9:26 a.m., BGPD received a call from XXX-XXX-6254 in which ST. JOHN stated that he had a "hit" out on a person in their community and identified himself by his full name. ST. JOHN provided a name and address that closely resembled the address of his ex-mother-in-law,[11] stating he had paid someone $10,000 to take her out by shooting her in the next couple of days through her window. ST. JOHN stated he was going to be killing a lot of people soon and was going to take out his entire family one by one for revenge. ST. JOHN stated he was in Nebraska on his way to Illinois, and that he was going to get weapons and was getting excited that he was going to kill people. ST. JOHN stated, "I'm excited, this is the first day, I'm um, I never killed someone so I'm um I'm getting excited, I'm getting pretty jacked up." ST. JOHN stated he was going to commit one of the biggest mass killings in history. ST. JOHN stated, "It's a profound moment, you're talking to a guy who is going to do one of the biggest killings in man's history and you don't know what to say to me." ST. JOHN stated he was going to chop his ex-wife into pieces later in the day and provided her

---

[10] This call was recorded, I listened to the call and I believe that it is ST. JOHN's voice, just as it is in the other calls described in this affidavit.

[11] ST. JOHN provided the correct name for his ex-mother-in-law. The address that ST. JOHN provided was close in number, included the same street name, but had the immediate neighboring town which was very close to the border of the correct address's town.

home address. ST. JOHN stated he was going to take out a judge and specifically stated it would be the judge on his dissolution of marriage.[12] ST. JOHN stated he was going to kill the judge. ST. JOHN stated "My, my biggest asset I'm gonna to take out, I'm taking out a judge, that's what I want, I'm gonna find a judge and I'm gonna take out a judge." When asked if there was a specific judge, ST. JOHN replied, "Uh, the one that's on my dissolution of marriage, LARENZA something, go look her up, she is in trouble, I will kill her." ST. JOHN stated he was going to start killing people today, was going to kill five people, would kill a person each day, he would put them in his trunk, and bury them in the desert.

54.     According to Chase Bank records, ST. JOHN made several purchases within several hours around the August 3, 2020 phone call described above. The locations of the transactions were in Mesquite, Nevada, approximately 1,700 miles from Chicago, Illinois.

55.     On or about August 5, 2020, at approximately 8:32 a.m., BGPD received a call from XXX-XXX-6254 in which ST. JOHN stated, in summary, he wanted to know who he needed to notify if he was planning on killing his ex-wife "today."

***IDENTIFICATION OF ST. JOHN, HIS PHONE NUMBER AND EMAIL ADDRESS***

56.     On or about July 9, 2020, Mrs. St. John listened to one of the audio recordings from NPD regarding the threats made by ST. JOHN. When the recording was started, she immediately recognized and identified the voice as ST. JOHN and that his number was XXX-XXX-6254.

---

[12] According to Cook County records, the judge who presided over ST. JOHN's divorce and signed the decree has a name that sounds somewhat similar to the name ST. JOHN gave on the call.

57.     On or about July 31, 2020, Mrs. St. John listed to approximately 16 audio recordings received by NPD and Detective Commander's voicemail. Mrs. St. John identified the voice in all the recordings as being ST. JOHN's.

58.     On or about August 11, 2020, Mrs. St. John listened to audio recordings received by AHPD, and she identified the voice in all the recordings as being ST.JOHN's.

59.     On or about July 22, 2020, a state-issued search warrant was executed and served on Sprint for XXX-XXX-6254. According to the search warrant returns received, effective August 22, 2014, XXX-XXX-6254 was subscribed to by "CHRISTOPHER ST. JOHN," at an address in Arlington Heights, Illinois, where ST. JOHN and Mrs. St. John lived prior to her current address and where ST. JOHN used to reside. According to Mrs. St. John, XXX-XXX-6254 is ST. JOHN's current telephone number and ST. JOHN has had that number for approximately 15 to 20 years. Mrs. St. John stated that she was on the telephone carrier plan with ST. JOHN through Sprint when they were first married in approximately 1998, which was when he received the telephone number. During their marriage and over the course of approximately the last two decades, Mrs. St. John has spoken, texted, and received voice mails from ST. JOHN's telephone number.

60.     On or about July 22, 2020, an Illinois state-issued search warrant was executed on Google for cstjohn324@gmail.com. According to the search warrant returns, the account was created on or about April 30, 2013, and listed "Chris St. John" as the subscriber with a recovery address of stjohnc@comcast.net and a recovery SMS number of XXX-XXX-6254, user phone number of XXX-XXX-6254. From on or about June 1, 2020, to on or about July 23, 2020, cstjohn324@gmail.com was active and remained registered to ST. JOHN at the above information.

*ARREST OF ST. JOHN*

61.     ST. JOHN was arrested on or about August 11, 2020, in Boulder, CO on a state

arrest warrant issued out of Illinois.  The iPhone was seized out of ST. JOHN's pocket incident

to his arrest and secured by arresting officers.  At the time of his arrest, ST. JOHN's vehicle was

subjected to an inventory search and the Laptop, Laptop Case and Papers were recovered and

secured.  The inventorying officer noted that the Papers appear to contain handwritten notes.

*ST. JOHN IS CHARGED IN THE NORTHERN DISTRICT OF ILLINOIS*

62.     On or about August 14, 2020, ST. JOHN was charged with violation of Title 18,

United States Code, Section 875(c) in criminal complaint 20-cr-503 in the Northern District of

Illinois for the conduct described in this Affidavit.  A warrant was issued for his arrest.

<u>**THE DEVICES & LAPTOP CASE AND PAPERS**</u>

63.     There is probable cause to believe that evidence of violation of Title 18, United

States Code, Section 875(c) (the "Subject Offense") will be located on the Devices.  As

described herein, ST. JOHN engaged in threatening communications via various media,

including telephone and email.  As described above, the iPhone is likely the phone used to make

those calls, so there is probable cause to believe the iPhone will contain evidence of the Subject

Offense in the form of call logs, location information, and the other information described in

Attachment B-1.  Similarly, there is probable cause to believe that the Laptop will contain

evidence of the Subject Offense in the form of email messages sent by ST. JOHN as well as the

other information described in Attachment B-1.

64.     There is also probable cause to believe that the Laptop Case and Papers will

contain evidence of the Subject Offense.  As described above, the Papers were located with the

Laptop, in ST. JOHN'S vehicle, in the Laptop Case.  Based on my training and experience,

individuals such as ST. JOHN, who make dozens and dozens of calls over a period of time often

keep notes of individuals to whom they have spoken and to whom they want to speak, in

furtherance of their threats and harassment.  In addition, individuals such as ST. JOHN often

keep a record of phone numbers they have called, and will continue to call, in furtherance of the

same mission.  I believe this to particularly true in this case, since the inventorying officer noted

that it appeared that the Papers contained handwritten notes.

65.     The Devices and Laptop Case and Papers are currently in the lawful possession of

the Boulder Police Department.   As described above, the Devices and Laptop Case and Papers

were seized upon ST. JOHN'S arrest.  Therefore, while law enforcement might already have all

necessary authority to examine these items, I seek this additional warrant out of an abundance of

caution to be certain that an examination of the Devices and Laptop Case and Papers will comply

with the Fourth Amendment and other applicable laws.

66.     In my training and experience, I know that the Devices have been stored in a

manner in which its contents are, to the extent material to this investigation, in substantially the

same state as they were when the Devices first came into the possession of law enforcement.

### TECHNICAL TERMS

67.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data communication

        through radio signals.  These telephones send signals through networks of

        transmitter/receivers, enabling communication with other wireless telephones or

        traditional "land line" telephones.  A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

68.    Based on my training, experience, and research, I know that the iPhone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

69.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

70.    There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

      d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

71.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain:

data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

72.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

73.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

74.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A-1 to seek the items

described in Attachment B-1 and the Laptop Case and Papers described in Attachment A-2 to

seek the items described in attachment B-2.


Respectfully submitted,

_/s  Herbert E. Hogberg III_____
Herbert E. Hogberg III
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
on August 26, 2020

HON. KRISTEN L. MIX
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

## ATTACHMENT A-1

a.  A silver MacBook Model A1990 with Serial #CO2Z2D92LVCF (the "Laptop"), and a gray iPhone packaged in a clear case (the "iPhone") (together, the "Devices") that were seized from Christopher St. John on August 11, 2020.  The Laptop is currently being held in Property and Evidence at the Boulder Police Department, 1805 33rd Street, Boulder, CO and the iPhone is currently at the Boulder County Computer Forensics Lab at 5600 Flatiron Parkway, Boulder, CO

b.  This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B-1.

## ATTACHMENT B-1

1.      All records on the Devices described in Attachment A-1 that relate to violations of 18 U.S.C. § 875(c) (the "Subject Offense") and involve Christopher St. John, including:

     a.    Any and all records, information, or evidence of repeated, threatening, or harassing phone calls, email messages, or repeated, threatening, or harassing messages via any other means of communication;

     b.    Any and all records and information pertaining to cellular telephone number XXX-XXX-6254 or other telephone numbers used by St. John;

     c.    Any and all records and information pertaining to and communications to or from email addresses cstjohn324@gmail.com and stjohnc@comcast.net;

     d.    Any and all records of Internet Protocol addresses used and records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

     e.    Location information tending to show St. John's whereabouts during the commission of the Subject Offense

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## <u>ATTACHMENT A-2</u>

The property to be searched are a laptop case and papers seized from Christopher St. John on August 11, 2020, and currently being held at Property and Evidence at the Boulder Police Department, 1805 33rd Street, Boulder, CO (the "Laptop Case and Papers").

## ATTACHMENT B-2

1.      The items described in Attachment A-2 that relate to violations of 18 U.S.C. § 875(c) (the "Subject Offense") and involve Christopher St. John, including:

      a.   Any and all records, information, or evidence of repeated, threatening, or harassing phone calls, email messages, or repeated, threatening, or harassing messages via any other means of communication;

      b.   Any and all records and information pertaining to cellular telephone number XXX-XXX-6254 or other telephone numbers used by St. John;

      c.   Any and all records and information pertaining to and communications to or from email addresses cstjohn324@gmail.com and stjohnc@comcast.net;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.